## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| MULTAPLY, INC.,<br>a Florida Corporation, | ) ) ) | CIVIL CASE NO.: |
| Plaintiff, | ) ) ) | **COMPLAINT FOR DAMAGES** |
| v. | ) ) | **DEMAND FOR JURY TRIAL** |
| JACOB KERN,<br>ABERDEEN FINANCIAL GROUP,<br>BRADWAY CAPITAL INSIGHT<br>FUND, LLC,<br>CHARLES W. SCHELLHORN<br>REVOCABLE TRUST,<br>CHRISTOPHER LANG,<br>MICHAEL J. HUFFER,<br>MAUREEN HUFFER,<br>MARK BRANDMEYER,<br>REBECCA A. MINION TRUST,<br>ROBERT L. WECHSLER,<br>ROBERT WITNEY,<br>ROGER GLAYZER,<br>RONALD ZOELLER,<br>ROBERT WILLIAMS,<br>DAVID LORBER,<br>HUFFER FAMILY, LLC,<br>ERIC NOVESHEN, and<br>TIMOTHY G. WAGNER, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants.<br>_____ | ) ) ) | |

## <u>COMPLAINT</u>

**COMES NOW** the Plaintiff, Multaply, Inc., a Florida corporation registered to do business in

the State of Florida, and sues the Defendants, Jacob Kern, *et al.*, as follows:

## THE NATURE OF THE ACTION

1.     This is an action for triple damages, costs and attorney fees under 18 U.S.C. §§1962 and 1964, otherwise known as the "Racketeer Influenced and Corrupt Organizations Act" or "RICO"; Florida Statute 772.104(1) and (2), otherwise known as "Florida RICO;" Civil Conspiracy; Fraud in the Inducement; and, in the alternative, for Breach of Contract.

## JURISDICTION AND VENUE

2.     Jurisdiction is proper in this Court because this case presents a federal question, pursuant to 28 U.S.C. § 1331, because this is a civil action for violations of 18 U.S.C. § 1961 et seq. ("Racketeer Influenced and Corrupt Organizations Act" or "RICO"). In addition, the Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving to Plaintiff's claim occurred in the Southern District of Florida.

## THE PARTIES

4.     The Plaintiff, Multaply, Inc., is a Florida Corporation, authorized to do business in the State of Florida having an address of 1799 W. Oakland Park Blvd., Suite 300, Fort Lauderdale, FL 33311.

5.     Defendants, Aberdeen Financial Group,       Bradway Capital Insight Fund, LLC, Charles W. Schellhorn Revocable Trust, Christopher Lang, Michael J. Huffer,      Jacob    Kern, Mark Brandmeyer, Michael Huffer, Maureen Huffer,       Rebecca A. Minion Trust, Robert L. Wechsler, Robert Witney, Roger Glayzer, Ronald Zoeller, Robert Williams, David Lorber, and Huffer Family, LLC (collectively hereinafter, "Noteholders") are all parties believed to located

in Kansas City, Mo., who entered into a sales agreement with Multiply, Inc., for the sale of a third party company, MicroVu, Inc., that is doing business in Broward County, Florida.

6.     Defendants, Eric Noveshen (hereinafter "Noveshen") and Timothy G. Wagner (hereinafter "Wagener") are residents of Broward County Florida.

### STATEMENT OF FACTS

7.     This case involves the sale of MicroVu, Inc., a Wyoming corporation (hereinafter, "MicroVu" or "Company"), by the Noteholders and Wagner to Multaply Inc., (hereinafter "Plaintiff" or "Buyer"), which occurred on or around December 31, 2014.  *See* **EXHIBIT A,** Agreement.

8.     Plaintiff was interested in purchasing MicroVu.  Even prior to negotiations, the Noteholders and Wagner knew that the Buyer was interested in purchasing a company that would be coupled with Multaply's ongoing business.  The Noteholders and Wagner knew that the entire purpose of the transaction was to add cash flow and revenues to Multaply's bottom line.

9.     Accordingly, the Noteholders and Wagner sold MicroVu under the guise that it would add revenues and cash flow to Multaply's previously existing business structure.  In addition, the Noteholders and Wagner knew that the most critical part of the transaction was Multaply's ability to build off of the already existing relationships that MicroVu had with its customers.

10.     The Noteholders and Wagner, knowing that the clients where critical to this transaction, purposefully hid from Multaply the fact that MicroVu's relationships with its clients were failing apart at the seams.  Had the Noteholders and Wagner truthfully disclosed the deteriorating relationship between MicroVu and its customers, Multaply would never have gone

Garrity Traina, PLLC
10394 West Sample Road, Suite 201, Coral Springs, FL 33065
Phone: (954) 753-6666          Fax: (954) 753-6663

through with the purchase of MicroVu.  Instead, the Noteholders and Wagner proceeded with the transaction despite the certain demise of the substantial investment made in both time and money in building both Multaply and MicroVu.  The Noteholders' and Wagner's actions have put the Plaintiff's financial condition at risk and caused it grave financial harm.

11.     Contrary to their designation in the purchase agreement as "Passive Shareholders," the Noteholders were in fact anything but.  MicroVu's emails dating back to 2009 confirm that the Noteholders were intimately involved in the operation of MicroVu prior to the sale to Plaintiff.

12.     The Noteholders were added to bank accounts as signatories. Throughout 2014 they acted as managers and decision makers regarding MicroVu's operations.  They were aware of the many complaints from existing customers regarding the quality of the auditing services being performed.  They were aware of MicroVu's inability to meet the requirements of its customers' vendor audits.  Further, they were aware of MicroVu's inability to gain new customers.

13.     In 2014, prior to the closing transaction, Wagner and the managing Noteholders knew that major customers had terminated, or were about to terminate, MicroVu's services.   Yet Wagner and the Noteholders entered into the Agreement which contained the following fraudulent statement:

> Section 5.13 Contracts. (a) Schedule 5.13 lists all contracts and agreements to which Company is a party and which are in effect on the date hereof including, without limitation:
>
> (ix) any contract with any customer of Company under which Company is obligated to sell Company products or services;
>
> (b) Except as set forth in Schedule 5.13, (i) each Contract is in full force and effect and is the legal, valid and binding obligation of Company and the other parties thereto (the "Other Parties"), and

(ii) neither Company, nor any of the Other Parties to any Contract is in breach, violation or default, and no event has occurred which with notice or lapse of time or both would constitute a breach, violation or default by Company or any Other Party, or permit termination, modification, or acceleration by the Other Parties under such Contract.

Schedule 5.13 is attached hereto as **EXHIBIT B**.

14.     Specifically, Anthem, MicroVu's largest customer representing more than 70 percent of its business, informed Wagner and the Noteholders in October 2014 that it was terminating its relationship with MicroVu months prior to the sale to Plaintiff.

15.     Likewise, prior to the closing, United Health Care terminated MicroVu as a vendor.  MicroVu employees' emails prior to closing clearly showed United Health Care's files were being boxed up for delivery back to the customer.  United Health Care business had been a substantial part of MicroVu's revenue and cash flow.  Ultimately, both Anthem and United Health Care were gone as customers within weeks of closing.

16.     Both customers not only represented critical revenue and cash flow but, equally as important, represented a substantial part of the goodwill to be used to help Multaply grow and succeed.

17.     Had Plaintiff known of the deterioration and demise of both of these relationships, it would have never gone through with this transaction.  The loss of revenue and cash flow would have made it impossible for MicroVu to continue operations—a fact known to the Wagner and the Noteholders who stood to lose substantial sums of money they had invested and lent to MicroVu.

18.     Therefore, it became paramount for Wagner and the Noteholders to find a buyer. However, the only way MicroVu would be purchased would be with the Noteholders' concealment of the fact that the business was imploding.  Wagner and the Noteholders did

exactly what they had to do to avoid losing their entire investment—they lied to sell the company.  They transmitted and mailed false documents and lured Plaintiff into to sending payment through wire transfer and the mails.

19.     The Noteholders, knowing that they were actively involved in the management, tried to distance themselves from this fraud by calling themselves "Passive Shareholders" in the purchase agreement.  In reality, the Noteholders were not passive but active in the fraudulent sale of MicroVu to the Plaintiff.  The company was sold as having great relationships with substantial customers when everyone on the inside knew MicroVu was a sinking ship.

20.     Moreover, it is clear from a review of MicroVu's records prior to closing that there were substantial, known problems with then-president Wagner.   Both records and statements from employees in place prior to the closing prove that the Noteholders were aware of Wagner's incompetency.  The Noteholders knew Wagner had a drug problem.  The Noteholders knew Wagner had misappropriated funds from MicroVu.  The Noteholders knew Wagner, and other key employees, were utterly incapable of turning MicroVu into a successful business.  In fact, the Noteholders communicated these concerns in several e-mails to Wagner in 2014.  Yet, none of the foregoing was disclosed to the Plaintiff. Instead, the Noteholders inexplicably required that Wagner be retained as MicroVu's president post-closing.

21.     As was later realized, the Noteholders required that Wagner retain his position because they needed him to provide the proper cover for Wagner's and the Noteholders' failure to disclose the loss of key customers.  In addition, it was necessary to have Wagner in place to carry out further transgressions against the Plaintiff after closing.

22.     Obviously, the Noteholders were still behind on their investment even after the sale, as MicroVu remained saddled by debts to the Noteholders.   At the same time the

Noteholders know that MicroVu's biggest customers had canceled their service agreements. Clearly, with a mere fraction of its client base there was no chance that Plaintiff would ever be able to pay the Noteholders from its operations.  However, MicroVu did have receivables at the time of the sale—receivables seemingly out of reach of the Noteholders.

23.     The Noteholders needed someone whom they knew had diverted funds in the past, because that was going to be their plan going forward.  Had Wagner's incompetency and dishonesty disclosed to the Plaintiff prior to closing, they would not have closed.  By failing to disclose Wagner's dishonesty, the Noteholders would have another opportunity to recover some of their investment.   Wagner, the Noteholders and newly recruited Noveshen diverted receivables belonging to the Plaintiff.   The following table represents receivables that went missing after the closing:

| | |
|---|---|
| Humana | ($224,908.76) |
| United | ($195,393.48) |
| Wellpoint | ($268,095.26) |
| Other | ($17,892.96) |
| Total Missing: | ($706,290.46) |

24.     With Wagner in place, the Noteholders had another opportunity to recover more of their initial investment.  In addition, there were several undisclosed MicroVu bank accounts that upon information and belief were used to deposit and clear the diverted funds.  Again, the Agreement stated:

> Section 5.26. Bank Accounts. Schedule 5.26 sets forth a correct and complete list of each bank account, trust company, savings institution, brokerage firm, mutual fund or other financial institution with which Company has an account, safe deposit or lock box and the names of all Persons authorized to draw on it or to have access to it.

Schedule 5.26 is attached as **EXHIBIT C**.  This was a false statement made by Wagner and the Noteholders and the undisclosed accounts were used to carry-out their fraudulently scheme with the aid of Noveshen.

25.     A witness provided a statement to the Plaintiff that immediately after closing Noveshen bragged that he and Wagner conspired with the Noteholders to divert hundreds of thousands of dollars from MicroVu for their own benefit.  Upon information and belief the money was diverted and then split 1/3 to Wagner, 1/3 Noveshen, and 1/3 to "Kansas City," i.e. the Noteholders.  Again, the scheme was carried out by the Noteholders' insistence on keeping Wagner in place as president of MicroVu after the Plaintiff's purchase.

26.     The loss of customers and the diversion of receivables made it impossible for MicroVu to service the debt owed to the Noteholders.  However, there was hope in the form of a new customer in Puerto Rico in the spring of 2015.  The projected deal would have created anywhere from an additional $500,000 to $1 mil. in revenue for MicroVu and enabled it to move forward even after the numerous acts of fraud.  Wagner and Noveshen were purportedly working to put the deal together.  It was believed that the deal was in place for the benefit of Plaintiff, as owner of MicroVu.  However, upon information and belief, that the deal was diverted to the benefit of Wagner, Noveshen and the Noteholders.

27.     The Plaintiff, still unaware of all the fraudulent activity, sought a new financier to continue operations and pay Noteholders.  Plaintiff was working on a financing deal with Swiss Allied Trust, Inc., with the aid of Wagner.  Plaintiff was in the final stages of redlined documents when the investors pulled out.  The reason the investor pulled out was reported to Plaintiff.  Wagner told the lead investor that MicroVu had no data, and had nothing of value.  Wagner intentionally sabotaged the investment to ensure MicroVu would remain in default.  This

information was shared by Wagner and Noveshen with the Noteholders in an almost celebratory fashion.

28.     While Wagner was telling Swiss Allied Trust that MicroVu had no data, he was busy downloading many files containing the data and setting up meetings to discuss data mining with new customers.  The data was stolen from Plaintiff and believed to have been sold to benefit the co-conspirators, including the Noteholders.

29.     The purchase agreement contains provisions whereby, in event of a default, ownership of MicroVu would revert to the Noteholders and Wagner.

30.     Knowing this, Wagner, Noveshen and the Noteholders were working on "Plan B" and had been all along.  Plan B was to get as much money as possible from Multaply as part of the sale, divert as much cash from the company as possible, and then to subvert all attempts by Plaintiff to succeed.

31.     In doing so, the Noteholders and Wagner, now flush with cash obtained from the purchase and through their misdeeds described herein, strove to cause Plaintiff to default under the purchase agreement so they could retake the company.

32.     Plaintiff has been forced to retain the undersigned law firm with regard to this lawsuit suit and has agreed to pay attorney fees and cost associated with this action.

## COUNT I
## VIOLATION OF 18 U.S.C. §1962(c)

33.     Plaintiff re-alleges and incorporates paragraphs 1 – 32 as if fully set forth herein.

34.     By engaging in a pattern of racketeering activity, specifically "mail or wire fraud," Defendants participated in a criminal enterprise affecting interstate commerce. The mail or wire fraud including the sending of false information upon which the Defendants required payment from the Plaintiff.  In addition, based on the false information the Plaintiff assumed debt of the

Defendants that it otherwise would not have assumed.   Moreover, the Defendants diverted Plaintiff's assets including accounts receivables, business opportunities and data by way of its fraudulent scheme and utilized the U.S. Mail, emails and wire transfers.

35.     The "predicate acts" of fraud, which were accomplished through the U.S. Mail, and which are specifically attributable to the Defendants subject to this Count, are:

  a.    Sending false information regarding the status of customers and accounts receivable in order to defraud Plaintiff of money.
  b.    Diverting money payable to Plaintiff.
  c.    Diverting business of the Plaintiff.
  d.    Diverting data of the Plaintiff.
  e.    Using false bank accounts.
  f.    Actively concealing these subversive and illegal acts.

36.     These predicate acts are related. They share the common purpose of defrauding the Plaintiff of their money and property. They share the common themes of diversion by way of fraud and concealment of material facts.

37.     The predicate acts satisfy the RICO continuity requirement: they extend from in or about 2014 through today and continue unabated, which meets the definition of "open-ended" continuity.   The threat of continued criminal activity as part of this enterprise in, without question, still looming over the Plaintiff as the Noteholders now make demand to be paid under their promissory notes even after all of the fraudulent activity.

38.     As the result of the RICO enterprise of which these actions were part, the Plaintiff has suffered damages, in that they have obligated themselves to debt, lost diverting money, lost diverted business, lost the value of diverted data and now face collection of the by the Noteholders.

39.     The Plaintiff is entitled to judgment in the amount of three times their actual damages, which will be proven at trial and amount to millions of dollars, plus costs and a reasonable attorneys' fee under 18 U.S.C. §1964(c).

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, for treble the total damages, plus costs, attorneys' fees, and such additional relief as the Court or jury may deem just and proper, including imposition of liability on the members of the conspiracy not presently named as Defendants in this action.

**PLAINTIFF DEMANDS TRIAL BY JURY ON COUNT I**

**COUNT II**
**CIVIL REMEDY FOR CRIMINAL PRACTICES**

40.     Plaintiff re-alleges and incorporates paragraphs 1 – 32 as if fully set forth herein.

41.     The allegations contained herein in Count II are a separate and distinct legal remedy brought pursuant to Florida Statute 772.104(1) and (2).

42.     By engaging in a pattern of racketeering activity, specifically "mail or wire fraud," Defendants participated in a criminal enterprise affecting interstate commerce. The mail or wire fraud including the sending of false information upon which the Defendants required payment from the Plaintiff.  In addition, based on the false information the Plaintiff assumed debt of the Defendants that it otherwise would not have assumed.  Moreover, the Defendants diverted Plaintiff's assets including accounts receivables, business opportunities and data by way of its fraudulent scheme and utilized the U.S. Mail, emails and wire transfers.

43.     The "predicate acts" of fraud, which were accomplished through the U.S. Mail, and which are specifically attributable to the Defendants subject to this Count, are:

GARRITY TRAINA, PLLC
10394 West Sample Road, Suite 201, Coral Springs, FL 33065
Phone: (954) 753-6666          Fax: (954) 753-6663

     a.     Sending false information regarding the status of customers and accounts receivable in order to defraud Plaintiff of money.
     b.     Diverting money payable to Plaintiff.
     c.     Diverting business of the Plaintiff.
     d.     Diverting data of the Plaintiff.
     e.     Using false bank accounts.
     f.     Actively concealing these subversive and illegal acts.

44.     These predicate acts are related. They share the common purpose of defrauding the Plaintiff of their money and property. They share the common themes of diversion by way of fraud and concealment of material facts.

45.     The predicate acts satisfy the RICO continuity requirement: they extend from in or about 2014 through today and continue unabated, which meets the definition of "open-ended" continuity.  The threat of continued criminal activity as part of this enterprise in, without question, still looming over the Plaintiff as the Noteholders now make demand to be paid under their promissory notes even after all of the fraudulent activity.

46.     As the result of the Florida RICO enterprise of which these actions were part, the Plaintiff has suffered damages, in that they have obligated themselves to debt, lost diverting money, lost diverted business, lost the value of diverted data and now face collection of the by the Noteholders.

47.     The Plaintiff is entitled to judgment in the amount of three times their actual damages, which will be proven at trial and amount to millions of dollars, plus costs and a reasonable attorneys' fee under Florida Statute 772.104 *et seq*.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, for treble the total damages, plus costs, attorneys' fees, and such additional relief as the Court or jury may deem just and proper, including imposition of liability on the members of the conspiracy not presently named as Defendants in this action.

**PLAINTIFF DEMANDS TRIAL BY JURY ON COUNT II**

**COUNT III**
**CIVIL CONSPIRACY**

48.     Plaintiff re-alleges and incorporates paragraphs 1 – 32 as if fully set forth herein.

49.     The elements of civil conspiracy under Florida law are: "(1) an agreement between two or more parties (2) to do an unlawful act by unlawful means (3) the committing of an overt act in pursuance of the conspiracy and (4) damage to the plaintiff as a result of the act." Bankers Life Ins. Co. v. Credit Suisse First Boston Corp., 590 F. Supp. 2d 1364, 1368 (M.D. Fla. 2008) (citing Walters v. Blankenship, 931 So. 2d 137, 140 (Fla. 5th DCA 2006)).

50.     In this case, the Defendants agreed to intentional misrepresent the sale of MicroVu, divert the accounts receivable, divert business, unlawfully take data and intentionally undermine the success of the business by overtly providing false information, directing payments by customers to themselves, directing business to themselves, making false statements to third parties, and taking data not belonging the them, which damaged the Plaintiff.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, for the total damages and such additional relief as the Court or jury may deem just and proper, including imposition of liability on the members of the conspiracy not presently named as Defendants in this action.

**PLAINTIFF DEMANDS TRIAL BY JURY ON COUNT III**

GARRITY TRAINA, PLLC
10394 West Sample Road, Suite 201, Coral Springs, FL 33065
Phone: (954) 753-6666          Fax: (954) 753-6663

<u>COUNT IV</u>
<u>FRAUD IN THE INDUCEMENT</u>

**Wagner and Noteholders**

51.    Plaintiff re-alleges and incorporates paragraphs 1 – 32 as if fully set forth herein.

52.    The elements necessary to state a cause of action for fraud in the inducement are 1) a false statement concerning a material fact, 2) knowledge by the person making the statement that the representation is false, 3) intent by the person making the statement that the representation will induce another to act upon it, and 4) reliance on the representation to the injury of the other party.

53.    Wagner and Noteholders made material misstatement of facts regarding MicroVu's ongoing business and assets, including but not limited to, falsely stating the status of ongoing business, falsely stating that all bank accounts had been disclosed, falsely stating that MicroVu had an insurance policy in place, and failing to disclose material issues regarding the fitness of current officers of the company.

54.    Wagner and the Noteholders knew the statements were false at the time of making them.

55.    Wagner and the Noteholders intended that the Plaintiff relied on the statements and complete the purchase of MicroVu.

56.    The Plaintiff did rely on the statements and complete the purchase of MicroVu and as a result has suffered damages.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, for damages, and such additional relief as the Court or jury may deem just and proper, including imposition of liability on the members of the conspiracy not presently named as Defendants in this action.

GARRITY TRAINA, PLLC
10394 West Sample Road, Suite 201, Coral Springs, FL 33065
Phone: (954) 753-6666          Fax: (954) 753-6663

**PLAINTIFF DEMANDS TRIAL BY JURY ON COUNT IV**

<u>COUNT V</u>
<u>BREACH OF CONTRACT IN THE ALTERNATIVE</u>

**Wagner and Noteholders**

57.      Plaintiff re-alleges and incorporates paragraphs 1 – 32 as if fully set forth herein, and pleads this cause of action in the alternative to the claim in Count IV.

58.      "The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." J.J. Gumberg Co. v. Janis Servs., Inc., 847 So. 2d 1048, 1049 (Fla. 4th DCA 2003) (quoting Abbott Lab., Inc. v. Gen. Elec. Capital, 765 So. 2d 737, 740 (Fla. 5th DCA 2000)).

59.      The Agreement between the parties specifically detailed the "on-going" business and affirmed that there was no knowledge of any termination of the agreements which was breach at the inception.  In addition, the Contract purported to disclose all bank accounts but that provision was breached, the contract disclosed that MicroVu had an insurance policy in place but it did not, the contract failed to disclose material issues regarding the fitness of current officers of the company.  All of these breaches constituted a breach of the expressed terms of the Agreement as well as the duty of good faith and faith dealing.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, for damages, plus costs, attorneys' fees as allowed by the contract, and such additional relief as the Court or jury may deem just and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY ON COUNT V**

DATED: <u>November 16, 2015</u>.

Respectfully Submitted,

**GARRITY TRAINA, PLLC**
*Counsel for Plaintiff*
10394 West Sample Road, Suite 201
Coral Springs, FL 33065
Telephone: (954) 753-6666
Facsimile:   (954) 753-6663

By: <u>/s/ Joseph D. Garrity</u>
**JOSEPH D. GARRITY, ESQ.**
Florida Bar No. 87531
jgarrity@garritytraina.com
**C.C. TRAINA, ESQ.**
Florida Bar No. 91238
ctraina@garritytraina.com
**CHRISTOPHER N. TRAINA, ESQ.**
Florida Bar No. 91001
chris@garritytraina.com
**JOSHUA W. ROSENBERG, ESQ.**
Florida Bar No. 88804
jrosenberg@garritytraina.com
gtpaservice@outlook.com (secondary)